IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:17-cr-00074(1) |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER ON DEFENDANT'S** |
| | : | **MOTION TO RECONSIDER** |
| JERRY BLACK, | : | |
| Defendant. | : | |

Before the Court is Defendant Jerry Black's Motion to Reconsider this Court's Order Denying his Motion to Suppress (Doc. 121), and the responsive memoranda (Docs. 123–25).

I.  FACTS[1]

On February 19, 2016, Cincinnati Police Officer Kerri Maloney prepared and presented an affidavit to a Hamilton County Magistrate Judge for a warrant to search 1821 Tuxworth Avenue, #1, Cincinnati, Ohio 45238. (Doc. 93-1.)  The warrant was issued and, as a result of the evidence seized, Defendant Jerry Black and non-party Juanda Bankhead were indicted in the Hamilton County, Ohio Court of Common Pleas.  Mr. Black was indicted on two counts of trafficking in marijuana, two counts of possession of marijuana, one count of receiving stolen property, and one count of having weapons while under a disability.  Ms. Bankhead was indicted on one count of trafficking in marijuana and one count of possession of marijuana.  On July 26, 2016, Mr. Black entered a plea of guilty to two counts of trafficking (reduced) and one count each of receiving stolen property and having weapons under a disability; he was sentenced to 18

---

[1] Certain background facts are taken from public records, specifically from the Hamilton County, Ohio Court of Common Pleas.  *See Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) (quoting *Granader v. Public Bank*, 417 F.2d 75, 82–83 (6th Cir. 1969) ("Federal courts may take judicial notice of proceedings in other courts of record.")).  This Court has "examined the record in state court in an effort to ascertain the facts." *Id.*

months in state custody. On August 2, 2016, Ms. Bankhead pled guilty to an amended and reduced charge of disorderly conduct; she simply was required to pay a $100.00 fine.

On June 21, 2017, Mr. Black was indicted by a federal grand jury with one count of conspiracy to possess with intent to distribute and to distribute marijuana, cocaine, and heroin, in violation of 21 U.S.C. § 846. (Doc. 1, Count 1 at PageID 1.) On September 29, 2017, he filed a Motion to Suppress with respect to any evidence seized from Tuxworth Avenue, arguing that no facts within the affidavit supported probable cause to search the property. (Doc. 93.) The Government opposed his Motion, arguing that the warrant was sufficient and, regardless, the *Leon* good-faith rule[2] would apply. (Doc. 99 at PageID 269–72.) As an initial matter, however, the Government maintained that Mr. Black lacked standing to contest the issuance of the search warrant (*id.* at PageID 266–68) and that his previous guilty plea in the state criminal proceeding acts as a waiver against collateral attack of the warrant in the federal case *(id.* at PageID 268–69).

On the question of standing, Mr. Black claimed a legitimate expectation of privacy at the Tuxworth Avenue property, and thus protection under the Fourth Amendment, based on his romantic relationship with tenant Juanda Bankhead. (Doc. 101 at PageID 284.) As her boyfriend, he was "a frequent and legitimate overnight guest of Ms. Bankhead at her apartment" on Tuxworth Avenue and thus "ha[d] standing to contest the validity of the search warrant." (*Id.*) To this end an evidentiary hearing was held on November 20, 2017, at which Ms. Bankhead testified. Thereafter, the Court took the Motion under submission.

Finding the standing issue dispositive, on December 20, 2017, the Court denied Mr. Black's Motion to Suppress:

---

[2] *United States v. Leon*, 468 U.S. 897, 922 (1984) (courts typically should not suppress "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant").

> "To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share." *Minnesota v. Olson*, 495 U.S. 91, 98 (1990). "Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Id.* "From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside." *Id.* at 99.
>
> **If the Court were to credit Ms. Bankhead's testimony—a textbook recitation of what distinguishes a "casual" visitor from one with a legitimate expectation of privacy—Defendant plainly would have standing to contest the search at Tuxworth Avenue.** *See United States v. Pollard*, 215 F.3d 643, 647–48 (6th Cir. 2000) (standing found when defendant had been friends with lessee for seven years, occasionally spent the night at the residence, kept personal belongings in the living room closet, and sometimes ate with the family during his visits). **However, the Court does not find Ms. Bankhead's scripted testimony at all believable.** Most astonishing was her denial that she neither saw nor smelled the 100 pounds of marijuana discovered in—and eventually seized from—her basement at Tuxworth Avenue, even though she testified that she did laundry in that space *every night*. This Court has a clear recollection of presiding at a previous criminal trial at which only 25 pounds of marijuana was present in the courtroom as evidence, and the smell was, in a word, overwhelming.
>
> Moreover, we question whether Ms. Bankhead actually resides at the Tuxworth property. At the hearing, the Government produced a "Residential Lease Agreement" for property located at 3164 Gobel Avenue, Apt. 2, Cincinnati, Ohio 45211 between Ms. Bankhead and a *different* landlord with a term beginning February 1, 2015 and ending March 1, 2016. (Government Exh. 2.) When asked about the overlap between this lease and the one for Tuxworth Avenue, she said that the dates "can't be right" because she "moved into Gobel" with her mother in 2014. Common sense, of course, undercuts this explanation. Surely a typical landlord—always mindful of the need to protect his interests in the event eviction proceedings become necessary—would not be so careless as to list incorrect start and end dates on a lease, particularly by a whole year *in the future*. The Court is not so gullible as to believe that both landlord *and* tenant failed to catch this mistake.

(Doc. 115 at PageID 412–13 (italic emphasis in original, bold emphasis added).) In its Order, the Court expressly did not render an opinion on the issue of "waiver" or on the merits of Mr. Black's Motion. (*Id.* at PageID 411.)

## II. DEFENDANT'S ARGUMENTS IN FAVOR OF RECONSIDERATION

Defendant urges the Court to reconsider its credibility assessment of Ms. Bankhead for two reasons. First, it was improper for the Court to doubt her testimony that she neither "saw nor smelled" the 100 pounds of marijuana found in her basement based on its own experience—in a prior trial—"at which only 25 pounds of marijuana was present in the courtroom as evidence, and the smell was, in a word, overwhelming." (Motion to Reconsider, Doc. 121 at at PageID 432 (quoting Order Denying Motion to Suppress, Doc. 115 at PageID 413).) Inasmuch as the Government introduced no evidence of how the marijuana seized from Tuxworth Avenue "was packaged, in what form it existed, where in the basement it was located, or for how long it had been stored there," the Court's conclusion was impermissibly grounded in "speculation and evidence outside the record." (*Id.* at PageID 432–33.)

Second, regarding the lease agreement for the Gobel Avenue apartment, the Court should have believed Ms. Bankhead's statement that the dates on it were wrong and that she indeed resided at Tuxworth on the day the search warrant was executed. In support of that testimony, Defendant now tenders the Affidavit of George Marshall, who avers that he owns the rental property at 3164 Goebel Avenue.[3] (Marshall Aff., Doc. 121-1 at PageID 436 (¶ 4).) Mr. Marshall confirms that Ms. Bankhead is a former tenant who, at his request, vacated the property because she was behind in her rent. (*Id.* (¶¶ 5–8).) And she vacated that property "by the end of February 2015," essentially a year prior to the search of Tuxworth Avenue. (*Id.* (¶¶ 9, 10).)

These reasons aside, Defendant independently maintains that the Government should be estopped from arguing that Defendant lacks standing to contest the search warrant because, in a "separate but related matter," it has "determined and asserted [that] Mr. Black resides at 1821

---

[3] Curiously, the lease identified by Ms. Bankhead at the November 20 hearing listed George "Kindle"—not George "Marshall" as landlord, and spelled the street name of the property "Gobel"—not "Goebel."

Tuxworth, #1." (Supplement to Motion to Reconsider, Doc. 123 at PageID 458.) Regarding co-Defendant Samuel Washington, on March 20, 2017, the very same Officer Maloney prepared and presented an affidavit to Hamilton County Magistrate Judge Brad Greenberg for a warrant to search 3213 Mayridge Court, #4, Cincinnati, Ohio 45211 (hereinafter, the "Mayridge Court" affidavit). (Doc. 123-1 at PageID 462–67.) Her application was made in connection with the ongoing investigation into the felony offenses (including assault, murder, and drug trafficking) committed by members of a group known as FDD (Focus Dedication and Discipline). (*Id.* at PageID 463.)

Although not the target of the warrant, Defendant was mentioned several times throughout four discrete paragraphs in Officer Maloney's supporting affidavit. For example, she states that, on November 11, 2015, a source of information to Task Force Officer Stratmann referred to Defendant as the "leader" of FDD and the "weed man" in the West End neighborhood of Cincinnati who would sell "ounces to pounds" of marijuana. (*Id.* at PageID 464.) Also according to Officer Maloney, "TFO Stratmann **identified 1821 Tuxworth Avenue as an address associated with Jerry BLACK** and other members of FDD." (*Id.* (emphasis added).) Continuing, she testified:

> On February 19, 2016 officers executed a search warrant **at the residence of Jerry BLACK at 1821 Tuxworth Ave #1**. During the search of the residence officers recovered approximately 49,700 grams of marijuana in the basement, $142,210 in the master bedroom closet, and 3 handguns in the master bedroom closet. Jerry BLACK told officers that FDD was not a gang. BLACK stated that FDD was a record label with artists all throughout Cincinnati and he was the CEO. Jerry BLACK pled guilty to Trafficking in Marijuana and Having Weapons Under Disability and was sentenced to the Ohio Department of Corrections. Your Affiant learned that FDD members continue to be involved in illegal activities to include drug trafficking throughout the city.

(*Id.* at PageID 464–65 (emphasis added).)[4] The position taken by Officer Maloney in support of the Maybridge warrant—Tuxworth Avenue *is* Jerry Black's residence—is "clearly inconsistent" with the position now taken by the Government—Tuxworth Avenue is *not* Jerry Black's residence—in response to Defendant's Motion to Suppress. (Doc. 123 at PageID 459.) This contradiction unfairly advantages the Government, and is a "perversion" of the judicial process. (*Id.* at PageID 458–59.) Accordingly, Defendant urges the Court to exercise its discretion, apply the doctrine of judicial estoppel, and prohibit the Government from arguing that he lacks standing to challenge the Tuxworth Avenue search warrant. (*Id.* at PageID 459–60.)

### III. ANALYSIS

**A. The Government may not contest Defendant's standing to challenge the Tuxworth Avenue search warrant.**

The Court concludes that application of the doctrine of "judicial estoppel" is appropriate here, which, in turn, necessitates a finding that the Government may not contest Defendant's standing to challenge the Tuxworth Avenue search warrant.

"The doctrine of judicial estoppel applies to a party who has successfully and unequivocally asserted a position in a prior proceeding; he is estopped from asserting an inconsistent position in a subsequent proceeding." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982). It may be applied "even if detrimental reliance or privity does not exist" because it "is intended to protect the integrity of the judicial process." *Id.* "Judicial estoppel addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite

---

[4] Other public records listing 1821 Tuxworth Avenue as Defendant's address include the traffic citation issued to him later in the evening of February 19, 2016 and the separate "Arrest & Investigation Report" completed in connection therewith:

> During traffic stop arrested [sic] was found in possession of a large quantity of marijuana in plain view. Officer's [sic] did search warrant **at his address 1821 Tuxworth Ave #1** and recovered several packages of marijuana prepared for distribution.

(*Id.* at PageID 468, 469 (emphasis added).)

6

in another tribunal. If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled." *Id.*

The Supreme Court has enumerated three factors that "typically inform" the decision whether to apply the doctrine in a particular case. *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001). "[A] party's later position must be 'clearly inconsistent' with its earlier position." *Id.* at 750. Courts also "regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" *Id.* (quoting *Edwards*, 690 F.2d at 599). Also relevant is "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751. These factors are neither "inflexible prerequisites" nor an "exhaustive formula," with the Court specifically counselling that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Id.*

Defendant correctly states that two of these three factors are present in this case. The Government's position as to whether Mr. Black resides at Tuxworth Avenue has done an unmistakable about-face. On May 20, 2017, Officer Maloney swore to Magistrate Judge Greenberg that Defendant lived there, but beginning on October 16, 2017, with the filing of the Government's memorandum in opposition to Defendant's Motion to Suppress made in this criminal proceeding, the United States Attorney took the position that Defendant had no "previous relationship with the residence" and there was no "indicia of acceptance into the household." (Doc. 99 at PageID 267; *see* Doc. 124 at PageID 490.) This turnaround, moreover, spawned both an "unfair advantage" for the Government and an "unfair detriment" against

7

Defendant. Had the Government not argued that Defendant lacked standing to challenge the constitutionality of the Tuxworth Avenue search warrant, Juanda Bankhead's testimony—credible or not—would have been unnecessary. Argument instead would have focused on whether Defendant is collaterally estopped from challenging the search warrant, and, if not, whether the warrant is constitutionally sufficient. As discussed below, neither of these arguments ultimately resolve in the Government's favor.

In the Court's view, the "balance of equities" tips toward estoppel. *See New Hampshire*, 532 U.S. at 751. The Mayridge Court affidavit was made on May 20, 2017 by the *same* Cincinnati Police Officer investigating the *same* drug trafficking conspiracy.[5] In it, she includes investigation details uncovered by TFO Stratmann who, for the November-December 2015 time period, identified Tuxworth Avenue as an address "associated with" Defendant, in addition to her own recitation that the search warrant at issue was executed "at the residence of Jerry BLACK." As of May 20, 2017, therefore, the date the Mayridge Court affidavit was made, the Government declared under oath that 1821 Tuxworth Avenue, #1 was Defendant's residence. The Government downplays this reference, insisting it had no "significant bearing" on the probable cause assessment made by Magistrate Judge Greenberg in issuing the warrant for Mayridge Court. (Doc. 124 at PageID 490.) The Court disagrees. Officer Maloney applied for a warrant to search not only the Mayridge Court property, but also the body of co-Defendant Washington within, whom she suspected of drug possession, drug trafficking, participating in a criminal gang, and felonious assault. (Doc. 123-1 at PageID 462–63.) Evidence that nearly 50,000 grams (in excess of 100 pounds) of marijuana, $142,210 in cash, and three handguns were found *at the residence* of Defendant, the alleged leader of the gang under investigation,

---

[5] The Government does not object to the admissibility of the Mayridge Court affidavit, which clearly falls within the "public records" exception to the rule against hearsay. *See* Fed. R. Evid. 803(8).

most certainly had to play some part in the "totality-of-the-circumstances" analysis required by *Illinois v. Gates*, 462 U.S. 213 (1983).

All these factors prompt the Court to decide that judicial estoppel bars the Government from arguing that Defendant lacks standing to contest the Tuxworth Avenue search warrant. The Court's prior Order (Doc. 115), therefore, is VACATED. We now must consider the Government's alternate contention, whether Mr. Black's previous guilty plea in the state criminal proceeding acts as a waiver against collateral attack of the warrant in this federal prosecution.

**B. Defendant's guilty plea in the state criminal proceeding does not bar him from challenging the constitutionality of the search warrant in this federal prosecution.**

The Government cites *United States v. Broce*, 488 U.S. 563 (1989) for the proposition that Defendant "has not called into question the voluntary and intelligent character of his prior plea," and hence cannot now contest "a matter that he has already waived by virtue of his guilty plea in the previous prosecution." (Doc. 99 at PageID 268–69.) *Broce*, however, is inapposite. In that case defendants pleaded guilty to two separate conspiracy indictments in a single proceeding and were sentenced as to both. 488 U.S. at 566. Thereafter they sought to collaterally attack the sentence in a motion filed pursuant to Fed. R. Crim P. 35(a), claiming that only one conspiracy existed and double jeopardy principles required the conviction and sentence as to the second indictment be set aside. *Id.* at 565. Yet because their underlying plea was both "counseled and voluntary," the Supreme Court rejected their bid to reopen the *original* criminal proceeding. *Id.* at 569.

Defendant, on the other hand, cites *Haring v. Prosise*, 462 U.S. 306 (1983). While not precisely on point, *Haring* is sufficiently instructive to resolve the estoppel question raised by the Government. John Franklin Prosise pleaded guilty in state court to one count of manufacturing phencyclidine ("PCP"). *Id.* at 308. While incarcerated, he filed a *pro se* civil action under 42

9

U.S.C. § 1983, claiming that state officers unlawfully searched his apartment in violation of the Fourth Amendment. *Id.* at 309. The district court granted summary judgment for the officers, reasoning that Prosise's failure to assert his Fourth Amendment claims in state court "constituted a waiver of that right precluding its assertion in **any** subsequent proceeding." *Id.* (emphasis added). The Court of Appeals reversed and remanded, and the matter made its way to the Supreme Court, which decided that his conviction in state court following his guilty plea did not bar a § 1983 action for an alleged constitutional violation "that was never considered in the state proceedings." *Id.* at 311, 322. The Court outright rejected the contention by the officers that "by pleading guilty Prosise should be deemed to have either admitted the legality of the search or waived any Fourth Amendment claim, thereby precluding him from asserting that claim in any subsequent suit." *Id.* at 318. Prosise made "no concession" as to whether the search of his apartment was proper under the Fourth Amendment, and none should be inferred. *Id.* It is "impermissible" to assume that a plea of guilty is grounded in a defendant's determination that "he would be unable to prevail on a motion to suppress evidence." *Id.* "[A] defendant's decision to plead guilty may have any number of other motivations." *Id.* (citing *Tollett v. Henderson*, 411 U.S. 258, 262–63 (1973) (citing *Brady v. United States*, 397 U.S. 742, 750 (1970))). Elaborating on the concept of waiver, the Court observed:

> Under our past decisions, as the District Court correctly recognized, a guilty plea results in the defendant's loss of any meaningful opportunity he might otherwise have had to challenge the admissibility of evidence obtained in violation of the Fourth Amendment. It does not follow, however, that a guilty plea is a "waiver" of antecedent Fourth Amendment claims that may be given effect outside the confines of the criminal proceeding. The Defendant's rights under the Fourth Amendment are not among the trial rights that he necessarily waives when he knowingly and voluntarily pleads guilty.

*Id.* at 320–21.

Here, according to counsel, the record in the state criminal proceeding reflects that Mr. Black filed a motion to suppress the evidence seized from Tuxworth Avenue, but withdrew it prior to pleading guilty. Thus, the motion was "never considered" in the state proceedings, and, under *Haring*, the Court may not infer that Mr. Black's guilty plea acts as a waiver now in *these* proceedings.[6]

A discussion of the merits of Defendant's Motion to Suppress follows.

## IV. THE TUXWORTH AVENUE SEARCH WARRANT

Defendant contends that no facts contained in Officer Maloney's affidavit support probable cause to search the Tuxworth Avenue residence, rendering the warrant invalid. Further, the improperly seized evidence cannot be saved by the *Leon* good-faith exception. The Court concurs.

### A. Standard of Law

### 1. Probable Cause

In determining whether a search warrant is supported by probable cause, a court may consider only the "four-corners of the affidavit." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971)). Thus, "information known to the officer but not conveyed to the magistrate is irrelevant." *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citation omitted)).

An affidavit must show a "likelihood of two things" to establish probable cause for a search. *Id.* (internal quotations and citations omitted). They are: "first, that the items sought are

---

[6] The "other" motivations prompting Mr. Black's guilty plea in the state proceedings are obvious. He pled guilty to reduced charges, a common enough occurrence. His girlfriend, however, hit the jackpot, so to speak. Originally facing an 11-year sentence, Juanda Bankhead pled guilty to a single count of disorderly conduct for which she received *no* jail time and had to pay a minimal $100 fine. In Ms. Bankhead's words, once "Mr. Black took responsibility" the State "let me go."

11

seizable by virtue of being connected with criminal activity; and second, that the items will be found in the place to be searched." *Id.* (citing *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 n.6 (1978))) (internal quotations omitted). "[E]vidence of a crime" is a critical component of a search warrant. *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) (citing *Zurcher*). To this end, an applicant for a search warrant must recite the statutory violation for which the warrant is requested on the face of the warrant or in the affidavit in support. *See United States v. Abboud*, 438 F.3d 554, 569–71 (6th Cir. 2006).

Probable cause exists when "common-sense" suggests a "fair probability" that contraband or evidence of a crime "will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he affidavit supporting the search warrant must demonstrate a **nexus** between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)) (emphasis added). "The connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *Id.* (quoting *Carpenter*, 360 F.3d at 595).

Probable cause "is not a high bar." *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014). "It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Id.* (citing *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (quoting *Gates*, 462 U.S. at 231, 238)) (internal quotations omitted) (alteration in original). A reviewing court should give "great deference" to a magistrate judge's probable cause determination and reverse only if it was "arbitrarily" made. *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009). And it should not engage in "line-by-line scrutiny of the warrant application's affidavit." *United States*

12

*v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). The affidavit should be judged "on the adequacy of what it **does** contain, not on what it **lacks**, or what a critic might say **should have been added**." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (emphases added).

*Gates* established its "totality-of-the-circumstances" analysis against the backdrop of a supporting affidavit based on a confidential informant's tip. "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." 462 U.S. at 232 (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972).) An informant's reliability, veracity, or basis of knowledge are relevant considerations, but should not be applied rigidly. *Id.* at 232–33; *see United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010) ("When an affidavit relies on hearsay information from a confidential informant, the judicial officer (and reviewing court) must consider the veracity, reliability, and basis of knowledge for that information **as part of** the totality-of-the-circumstances review.") (emphasis added); *see also United States v. King*, 227 F.3d 732, 740 (6th Cir. 2000) (Veracity, reliability, and basis of knowledge of the tip "**are relative** where the strength of one factor may compensate for the deficiency of another." (citing *Gates*, 462 U.S. at 230, 238–39)) (emphasis added).

### 2. Good-Faith Exception to Exclusionary Rule

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). But courts typically should *not* suppress "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). The four specific situations in which an officer's reliance cannot be considered "objectively reasonable" are: (1) when the warrant is issued on the basis of an affidavit that an affiant

13

knows—or is reckless in not knowing—contains false information; (2) when the issuing magistrate abandons his or her neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon*).

### B. The Affidavit

As discussed, on February 19, 2016 Cincinnati Police Officer Kerri Maloney, a member of the Gang Enforcement Squad, made the affidavit in support of the search warrant application for Tuxworth Avenue. (Doc. 93-1.) In the affidavit, Maloney avers that she and brother and sister officers have been contacted by "numerous" confidential informants and sources of information who state that members of FDD have been involved in "[marijuana] trafficking and violent offenses throughout the city of Cincinnati in the last year." (*Id.* at PageID 251.) Members of FDD "have posted videos online on open sources of information displaying marijuana and firearms." (*Id.*) Additionally, members of FDD "are currently awaiting trial for felonious assault and homicide offenses that occurred on 5/3/16 [sic], 5/6/15, 5/9/15 and 10/14/15 in the city of Cincinnati." (*Id.*) Maloney further avers that she and brother and sister officers "have discovered that members of FDD and the marijuana trafficking group have been using 1821 Tuxworth Ave. #1 as a residence." (*Id.*) Through "departmental resources" law enforcement has learned that the residence is "associated with" Juanda Bankhead, who, in turn, is an "associate" of Defendant Jerry Black, the "identified" leader of FDD and the marijuana trafficking group. (*Id.*)

In January 2016, brother and sister officers observed a white Chevrolet SUV (Ohio plate GKM4597), model year 2007, parked outside the Tuxworth Avenue property. This vehicle is registered to Damondo (aka "Mondo") Black,[7] known to law enforcement[8] as "second in charge" of FDD and the marijuana trafficking group. (*Id.*) On February 16, 2016, law enforcement conducted surveillance at Tuxworth, and observed a grey BMW (Ohio plate GQE7515) "pull into the rear of the location and park." (*Id.*) Officers then saw Damondo Black walk from the rear of the location to the front door, which he unlocked, allowing him to enter the residence. (*Id.*) Damondo Black then was observed leaving the residence, locking the front door, and returning to the grey BMW parked in the rear of the location. (*Id.*) A short time later, Damondo Black was stopped by patrol officers for a traffic violation. (*Id.* at PageID 252.) Found in possession of personal use marijuana, he was issued a ticket and sent on his way. (*Id.*) Law enforcement still conducting surveillance at Tuxworth observed Damondo Black return to the property in the same grey BMW, unlock the front door, enter, and then later leave. (*Id.*)

Officer Maloney ran a Regional Crime Information Center ("RCIC") inquiry and learned that Damondo Black was twice convicted of drug possession in Hamilton County. (*Id.*) Additionally, he was convicted of drug trafficking (including cocaine and marijuana) in Kentucky four separate times, with the fourth conviction also including a gun charge. (*Id.*)

### C. Probable cause does not support the warrant, and the evidence improperly seized cannot be saved by the *Leon* good-faith exception.

Several deficiencies attend Officer Maloney's affidavit. First, there is no language, even boilerplate language, attesting to the reliability or credibility of the confidential informants and

---

[7] Like Samuel Washington, Damondo Black also is a co-Defendant in this criminal prosecution. Because he shares the same surname as Defendant Jerry Black, Damondo Black will be referred to by his full name.

[8] This information was acquired "through monitoring recorded jail calls made by other members of FDD and the marijuana trafficking group who have been and or that are currently in custody at the Hamilton County Justice Center, various types of social media, and interviews with sources of information and confidential informants." (Doc. 93-1 at PageID 251.)

15

sources of information providing tips to law enforcement about FDD. Second, while brother officers claim to have observed various vehicles "directly related to higher ranking members of FDD and the marijuana trafficking group," only one vehicle was specifically identified and independently confirmed as belonging to "second in charge" Damondo Black. (*See id.* at PageID 251.) Seen once in January, Damondo Black was seen again at Tuxworth—twice in fact—on February 19, 2016, the day application for the warrant was made. Yet officers merely observed him enter and exit the residence, drive away, and enter and exit the residence again. While he was found in possession of *personal use* marijuana during the traffic stop in-between, this discovery is hardly indicative of marijuana *trafficking*.[9]

Having focused first on what the affidavit *does* contain, we cannot help but underscore now what it does *not*. There is no recitation that either law enforcement or any source of information saw marijuana inside the residence or transported to and from the residence. There is no record of a drug purchase—controlled or otherwise—at the residence. There is no evidence of a trash pull that tested positive for marijuana. There is, quite simply, *nothing* that connects marijuana with Tuxworth Avenue, other than Officer Maloney's bald assertion that "Damondo Black and other members of FDD and the marijuana trafficking group are utilizing this [residence] to store marijuana and conduct marijuana trafficking business." (*Id.* at PageID 252.)

The Fourth Amendment obviously requires more. *Brown*, 828 F.3d at 382 (search warrant affidavit contained no evidence that the defendant distributed narcotics from his home or used it to store narcotics, or that any suspicious activity had occurred there). In *United States v. Higgins*, officers conducted a traffic stop and recovered a large amount of cocaine and cocaine

---

[9] Arguably the affidavit contains evidence that Damondo Black is a known drug dealer, but there is no allegation that Tuxworth Avenue is *his* residence. Rather, the affidavit states that the residence is "associated with" Ms. Bankhead who is called an "associate" of Defendant Jerry Black, "the identified leader of FDD." But even if Tuxworth had been alleged to be Damondo Black's residence—and thus the residence of a known drug dealer—that fact, "standing alone," is not enough to justify a warrant. *See Brown*, 828 F.3d at 383.

16

base. 571 F.2d 381, 385 (6th Cir. 2009). The driver identified the person from whom he bought the drugs, defendant Oliver Higgins, as well as the specific location of the buy. The two passengers in the car, each interviewed separately, confirmed that they rode with the driver to the location. The driver added that he had purchased narcotics from this location on previous occasions as well. Law enforcement transported the driver back to the location from which he claimed to have purchased the drugs to confirm. Law enforcement also verified that Higgins resided at this location, owned the motorcycle parked outside, and had two prior felony convictions for narcotics trafficking. A search warrant for the residence was issued, where police found crack cocaine, powder cocaine, marijuana, money, a gun, digital scales, rolling papers, and mail addressed to Higgins. *Id.* at 385. The defendant's motion to suppress, filed after he was indicted, was denied and he was later convicted. *Id.* at 386–87. On appeal, the Sixth Circuit concluded that the search warrant for Higgins's residence was not supported by probable cause:

> The informant gave his statements after the police discovered a large amount of drugs in his car, giving him an incentive to cooperate with the police to help himself. The affidavit contains no assertion that this informant is known to be reliable, nor did the police corroborate any of the informant's statements beyond the innocent fact that Higgins lived at the stated location and the irrelevant (to the determination of whether Higgins's house contained evidence of a present-day crime) fact that Higgins had a criminal record. **Nor does the affidavit contain any assertion that the informant had been inside Higgins's apartment or that the informant had seen drugs or other evidence in or around Higgins's apartment.**

*Id.* at 390 (emphasis added). *Higgins* undeniably dictates a finding that the Tuxworth Avenue warrant is deficient. Calling the affidavit "weak, but [ ] not bare bones," *Higgins* nonetheless concluded that the *Leon* good-faith exception saved its warrant. This Court cannot follow suit, as we determine that the affidavit here is, just, "bare bones."

The evidence seized from 1821 Tuxworth Avenue, #1, Cincinnati, Ohio 45238 will be suppressed.

## V. CONCLUSION

Defendant Jerry Black's Motion to Reconsider this Court's Order Denying his Motion to Suppress (Doc. 121) is **GRANTED**. This Court's December 20, 2017 Order Denying Defendant's Motion to Suppress (Doc. 115)—based on a finding that Defendant Jerry Black lacked standing to contest the validity of the search warrant executed on February19, 2016 at 1821 Tuxworth Avenue, #1, Cincinnati, Ohio 45238—is **VACATED**. Defendant Jerry Black's Motion to Suppress evidence obtained during the execution of the Tuxworth Avenue search warrant (Doc. 93) is—on its merits—**GRANTED**.

**IT IS SO ORDERED**.

Dated: 2/14/18         S/Susan J. Dlott_____
                       Judge Susan J. Dlott
                       United States District Court